**THIRD DIVISION**
**MCFADDEN, C. J.,**
**DOYLE, P. J., and HODGES, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

***DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.***

**June 10, 2020**

# In the Court of Appeals of Georgia

A20A0365. MULLINS v. THE STATE.                    DO-014 C

DOYLE, Presiding Judge.

Following a traffic stop, Danzel Mullins was charged with possession with intent to distribute a controlled substance, theft by receiving stolen property, and possession of tools for the commission of a crime. He moved to suppress all evidence obtained as a result of the traffic stop on multiple grounds, and the trial court denied the motion following a hearing. Mullins appeals, arguing that: the investigatory stop of the vehicle was unreasonably delayed and evolved into an arrest; officers did not have probable cause to arrest him before the search of the vehicle; and impoundment of the vehicle was not reasonably necessary because he was not under arrest and the inventory search violated his Fourth Amendment right to privacy. For the reasons that follow, we reverse.

In a hearing on a motion to suppress, the trial court sits as the trier of fact and its findings are analogous to a jury verdict. Accordingly, we defer to the trial court's credibility determinations and will not disturb its factual findings in the absence of clear error. And when reviewing the grant or denial of a motion to suppress, an appellate court must construe the evidentiary record in the light most favorable to the trial court's factual findings and judgment. Additionally, as a general rule, an appellate court must limit its consideration of the disputed facts to those expressly found by the trial court. An appellate court may, however, consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from a videotape. Finally, although we defer to the trial court's fact-finding, we owe no deference to the trial court's legal conclusions. Instead, we independently apply the law to the facts as found by the trial court.[1]

So viewed, the record shows that on August 28, 2018, a license plate reader ("LPR") identified a car that was involved in a vehicle break-in involving three black

---

[1] (Citations and punctuation omitted.) *State v. Shaw*, 353 Ga. App. 102 (836 SE2d 208) (2019). See also *Mathenia v. Brumbelow*, ___ Ga. ___, ___ (1) (S19G0426, decided May 18, 2020) (explaining that when reviewing a trial court's ruling, [w]e . . . limit our discussion . . . to the facts as found by the superior court and supported by the evidence, viewed in the light most favorable to the superior court's ruling[,] . . . [because] with respect to evidence of record not referenced in a trial court's findings of fact: We do not know . . . exactly why the trial court said nothing about these things. But we do know that the trial court could have assigned no weight at all to the testimony of the witnesses about these things to the extent that it found that their testimony was not credible.") (citation and punctuation omitted).

males the previous day. The officer initiated a traffic stop of the car, and Mullins – the driver, who was one of three black males in the car – stopped the car immediately, and produced his driver's license, which the officer found to be valid, with no outstanding warrants. When the officer returned to the car, the front passenger advised that his sister's boyfriend had rented it the day before, although he did not have the rental agreement. Mullins told the officer that he "got the vehicle earlier that day" to take the front passenger to traffic court and that he had just picked up the front passenger from court, after which he had picked up the back seat passenger. Approximately five or six minutes after the traffic stop began, Mullins turned off the car and gave the officer his car keys, at the officer's request. The officer checked the passengers' identities and found no outstanding warrants. According to the officer, Mullins and the other two men were "being detained" at that time and were not free to leave.

An investigator who responded approximately 38 minutes after the traffic stop began also questioned the three occupants. Following that questioning, the investigator sent yet another officer to watch a surveillance video recording of the prior day's vehicle break-in to determine whether the faces of the perpetrators were visible. The investigator advised the initial officer that if the video did not show the

3

faces of the suspects, police would not have probable cause to arrest Mullins and the other two men being detained.[2] Approximately 20 minutes later, that officer reported that no faces could be seen in the video recording, although one of the men in the recording was wearing grey pants and white shoes, which purportedly matched clothing worn by the back seat passenger.[3] When the occupants denied consent to search the car, the investigator told them that if they did not consent, they would have to wait while she tried to obtain a search warrant.

The officer testified that the investigator subsequently contacted an unidentified representative of the car rental company, who "advised" the investigator to impound the vehicle because none of its occupants was an authorized driver on the rental agreement. As a result, approximately one hour and 52 minutes after the traffic stop began, the investigator told other officers at the scene to impound the vehicle. The three occupants were then removed from the car and placed in handcuffs, although, according to the officer who testified at the hearing, they were not yet under

[2] The initial officer testified that if the video did not show the faces of the suspects, the plan was to release the men after taking their photos and completing a field information form.

[3] In a video recording from the testifying officer's body camera, the officers' discussion of this issue is equivocal as to whether the prior day's recording shows a perpetrator wearing white *shoes* or a white *shirt*.

arrest.[4] Officers then conducted an inventory search of the car, during which they found, among other things, four Xanax pills and several items that had been reported as stolen from another car earlier that day. At that point, police considered the car's occupants to be "in custody" and advised the men of their *Miranda*[5] rights and further questioned them. No search warrant ever was obtained. The officer who testified did not personally attempt to contact any of the drivers authorized by the rental agreement, nor did he know if any other officers did so.

At the conclusion of the hearing, the trial court denied Mullins's motion to suppress, stating in its order:

> [An officer] testified that an LPR hit was raised for the vehicle containing the [d]efendants because it had allegedly been involved in several car thefts. He further explained that the [d]efendants were detained during the stop while ownership information about the car was verified. The [d]efendants could not produce any documentation to show that they either owned the vehicle or, as they alleged, rented the vehicle from Enterprise Rent-A-Car. After officers were able to speak with Enterprise about the rental agreement associated with the car, they were instructed to impound it. While conducting a routine inventory search

---

[4] The testifying officer conceded that there was no probable cause to make an arrest for charges relating to the car break-in.

[5] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

of the vehicle, [the officer] testified[,] . . . his team recovered illegal drugs, tools used for the commission of crimes, and reported items stolen from other vehicles. . . .*This [c]ourt finds that officers had probable cause to arrest [Mullins,] and . . . the subsequent physical evidence found was not fruit of an illegal search.*[6]

The court subsequently certified its order for immediate review, and this Court granted Mullins's application for an interlocutory appeal.

1. Among other arguments, Mullins contends that, during the traffic stop that led to his arrest, officers failed to diligently pursue a means of investigation likely to confirm or dispel the suspicion giving rise to the stop, and thus unreasonably prolonged the stop beyond the time needed to effectuate its purpose. We agree.

Once a valid traffic stop has been effected [by a law enforcement officer], the Fourth Amendment prohibits the officer from unreasonably prolonging the stop beyond the time required to fulfill the purpose of the stop without a reasonable articulable suspicion of other illegal activity. But a reasonable time to conduct a traffic stop includes the time necessary for the officer to run a computer check on the validity of the driver's license and registration[] and to check for outstanding warrants and/or criminal histories on the driver and other occupants. The law further allows the officer to question the vehicle's driver and/or its occupants during the course of the stop, and even to lawfully ask

---

[6] (Emphasis supplied.)

6

questions unrelated to the purpose of a valid traffic stop, so long as the questioning does not unreasonably prolong the detention.[7]

Thus, "[a]n investigative detention must last no longer than necessary to effectuate the purpose of the stop, and the investigative methods employed should be the least intrusive means reasonably available."[8] "[I]n assessing whether a detention is too long in duration to be justified as an investigative stop, [it is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."[9] Although "no bright line rule or rigid time limitations can be imposed in determining whether detention of a person constitutes

---

[7] (Citations and punctuation omitted.) *Young v. State*, 310 Ga. App. 270, 272-273 (712 SE2d 652) (2011). See also *Barraco v. State*, 244 Ga. App. 849, 850 (1) (537 SE2d 114) (2000) ("[A]n investigatory traffic stop should be limited in time to that minimally necessary to investigate the allegation invoking suspicion, and limited in scope to identification and limited questioning reasonably related to the circumstances that justified the initiation of the momentary stop.") (punctuation omitted); cf. *Rodriguez v. United States*, 575 U. S. __, __ (135 SCt 1609, 191 LE2d 492) (2015) ("A seizure justified only by a police-observed traffic violation . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation.") (punctuation omitted).

[8] *State v. Jones*, 245 Ga. App. 763, 766-767 (2) (538 SE2d 819) (2000).

[9] (Punctuation omitted.) *Grandberry v. State*, 289 Ga. App. 534, 538 (2) (658 SE2d 161) (2008).

7

a mere investigative stop requiring only an articulable suspicion or an arrest requiring the existence of probable cause at its inception," this Court has held that "it would stretch the imagination to say that a 30-minute [investigatory] detention was justifiable . . . when the officer waited for the arrival of a drug dog and magistrate and the defendant was not free to leave."[10]

Here, assuming that the initial traffic stop was justified by the LPR alert, the State has not met its burden of showing that officers reasonably and diligently sought to confirm or dispel their suspicions as to the purpose for the initial stop, which was premised on a vehicle break-in the day before. In particular, during the suppression hearing, the State failed to establish why it was reasonable for Mullins to be detained for more than 38 minutes before anyone endeavored to review the surveillance video of the prior day's break-in – which took yet another 20 minutes – and, after that, for another 54 minutes before a decision was made to impound the car and handcuff its occupants.[11]

_____

[10] (Punctuation omitted.) *DiSanti v. State*, 190 Ga. App. 331, 334 (1) (378 SE2d 729) (1989).

[11] See *Grandberry*, 289 Ga. App. at 538-539 (2) (the defendant's detention for 40 minutes following a traffic stop while officers engaged in an "investigation [that] could not be reasonably characterized as likely to conclude within any particular time frame" by "riding around in the area in the hopes that they would find the complainant" – whom

The trial court's order states that the evidence in the car was found during "a routine inventory search of the vehicle," and the evidence shows that the inventory search was conducted pursuant to impoundment of the vehicle. The trial court also concludes, however, that the "officers had probable cause to arrest [Mullins] and that the *subsequent* physical evidence found was not fruit of an illegal search." To the extent that the trial court found that the officers had probable cause to arrest Mullins and the other occupants *before* the inventory search, that finding is not supported by the evidence from the suppression hearing, including the testimony of the officer. According to police, they did not have probable cause to arrest the occupants of the car, and after determining that they could not identify the suspects' faces from the video almost an hour into the stop, they detained them further only to either obtain a search warrant or find an unrelated reason to impound the vehicle.

---

officers had no way of contacting – exceeded the scope of the initial investigatory stop, which was based on a "be on the lookout" for a car matching the defendant's car); *Jones*, 245 Ga. App. at 766-767 (2) (an officer who initiated a traffic stop predicated on a "be on the lookout" for a car matching the defendant's car unreasonably detained the defendant for 15-20 minutes while waiting for another officer to arrive before conducting a canine search); *DiSanti*, 190 Ga. App. at 334 (1) (the defendant's investigatory detention matured into a full arrest when, 20 minutes after the initial traffic stop began, and after the officer had issued the defendant a warning ticket for speeding – the basis for the stop – the defendant refused consent to search a package in his car and was no longer free to leave).

Given the length of Mullins's detention and the State's failure to establish diligence by the officers during that detention, Mullins effectively was under arrest well before the search occurred.[12] Even assuming that the generalized clothing match between one of the men in the video recording and the back seat passenger potentially may have warranted further investigation at the time it was discovered, that fact did not become known until 58 minutes after the traffic stop began, at which point officers already had prolonged the traffic stop unreasonably.

> Because the
>
> police lacked objective facts and circumstances to believe [Mullins] had committed a crime, they lacked probable cause to detain him beyond that authorized by *Terry*.[13] The police discovered the [evidence in the car] after [Mullins] had been illegally detained. This evidence was discovered by exploitation of the violation of [Mullins's] Fourth Amendment rights and is therefore inadmissible as the "fruit of the poisonous tree."[14]

Thus, the trial court erred by denying Mullins's motion to suppress.

---

[12] See *Jones*, 245 Ga. App. at 767 (2) (the defendant's prolonged detention constituted an arrest, which was unauthorized absent probable cause); *DiSanti*, 190 Ga. App. at 334-335 (1) (same).

[13] *Terry v. Ohio*, 392 U. S. 1 (88 SCt 1868, 20 LE2d 889) (1968).

[14] *Grandberry*, 289 Ga. App. at 539 (2).

10

*Judgment reversed. McFadden, C. J., and Hodges, J., concur.*